No. 22–1280
No. 22–1376

# United States Court of Appeals for the Third Circuit

EPSILON ENERGY USA, INC.,

*Plaintiff–Appellant,*

v.

CHESAPEAKE APPALACHIA, LLC,

*Defendant–Appellee.*

On Appeal from the United States District Court
for the Middle District of Pennsylvania
Case No. 1:21–cv–658

## FIRST–STEP BRIEF OF APPELLANT/CROSS–APPELLEE

Gregory J. Krock
MCGUIREWOODS LLP
Tower Two–Sixty
260 Forbes Ave., Suite 1800
Pittsburgh, PA 15222–3142
(412) 667–6042

Matthew A. Fitzgerald
MCGUIREWOODS LLP
800 East Canal Street
Richmond, VA 23219-3916
(804) 775-4716

Elizabeth M. Thomas
MCGUIREWOODS LLP
201 North Tryon Street
Suite 3000
Charlotte, NC 28202-2146
(704) 373-8060

*Counsel for Appellant/Cross–Appellee
Epsilon Energy USA, Inc.*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Appellant/Cross–Appellee Epsilon Energy USA, Inc. states that Epsilon Energy Ltd. owns 10% or more of its stock.

*s/ Gregory J. Krock*
Gregory J. Krock

*Counsel for Appellant/Cross–Appellee*
*Epsilon Energy USA, Inc.*

# <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ..................................................................................1

STATEMENT OF RELATED CASES ..................................................4

STATEMENT OF JURISDICTION.......................................................5

ISSUES PRESENTED............................................................................6

STATEMENT OF THE CASE................................................................7

      A.    The Joint Operating Agreements.........................................8

           1.    Proposals to Conduct Operations Under the JOAs...................9

           2.    Operations Involving Less Than All JOA Parties ....................9

           3.    Proposals to Drill New Wells ................................11

      B.    The Settlement Agreement Resolving Prior Litigation.....................12

      C.    The Current Litigation Involving Epsilon's Rights Under the JOAs and Settlement Agreement ......................................13

           1.    The Complaint and Motion for Preliminary Injunction...........14

           2.    The Amended Complaint.........................................15

           3.    The Motion to Dismiss the Amended Complaint....................16

           4.    The Dismissal of the Amended Complaint.............................17

           5.    The Motion for Reconsideration...............................19

SUMMARY OF THE ARGUMENT ......................................................19

STANDARD OF REVIEW ...................................................................22

ARGUMENT ........................................................................................23

      A.    The 90-Day Deadline Does Not Unambiguously Apply to the Drilling of New Wells. ........................................................23

i

Page

1.   The plain text of Article VI.2(a) does not apply the 90-day limit to drilling new wells. ........................................................24

2.   The District Court's ruling would eliminate the modification made to the Model Form. ..........................................................26

3.   The rest of Article VI favors Epsilon's interpretation by making clear that wells can be drilled without unanimous consent. ...................................................................................27

4.   Article XVI further supports Epsilon's view by requiring proposals to drill a new well to include a commencement date. ........................................................................................29

5.   Chesapeake's course of performance under the JOAs and Settlement Agreement confirms Epsilon's view. .....................32

B.   The District Court Erroneously Dismissed the Amended Complaint Without Leave to Amend ..................................................36

1.   Epsilon did not need to issue valid proposals to drill new wells in order to pursue a declaratory judgment claim. ....................37

2.   The Amended Complaint included a general request to declare Epsilon's right to drill new wells under the JOAs....................39

3.   The District Court's admission that Epsilon could plead a valid claim for declaratory relief confirms that its dismissal without leave to amend was erroneous. .................................................42

CONCLUSION ....................................................................................44

CERTIFICATE OF BAR MEMBERSHIP...............................................46

CERTIFICATE OF COMPLIANCE REGARDING FORM OF BRIEF ..............46

CERTIFICATE OF COMPLIANCE WITH VIRUS CHECK..............................47

CERTIFICATE OF SERVICE ...............................................................48

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## <u>Federal Cases</u>

*ACandS, Inc. v. Aetna Cas. & Sur. Co.*,
  666 F.2d 819 (3d Cir. 1981) ..................................................................37

*Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*,
  247 F.3d 79 (3d Cir. 2001) ...................................24, 26-27, 31-32, 36

*Borelli v. City of Reading*,
  532 F.2d 950 (3d Cir. 1976) ..................................................................42

*Brown v. Agway Energy Servs., LLC*,
  822 F. Appx 100 (3d Cir. 2020) ...........................................................22

*Calvitti v. Anthony & Sylvan Pools Corp.*,
  351 F. Appx 651 (3d Cir. 2009) ...........................................................22

*Chambers v. Chesapeake Appalachia, L.L.C.*,
  359 F. Supp.3d 268 (M.D. Pa. 2019) ...................................................23

*United States ex rel. Customs Fraud Investigations, LLC. v. Victaulic Co.*,
  839 F.3d 242 (3d Cir. 2016) ..................................................................42

*Gannaway v. Stroumbakis*,
  842 F. Appx 725 (3d Cir. 2021) ...........................................................42

*Hardware Mut. Cas. Co. v. Schantz*,
  178 F.2d 779 (5th Cir. 1949) ................................................................37

*Langer v. Monarch Life Ins. Co.*,
  879 F.2d 75 (3d Cir. 1989) ...............................................................34-35

*Pacific Employers Ins. Co. v. Global Reinsurance Corp. of Am.*,
  693 F.3d 417 (3d Cir. 2012) ..................................................................28

*Philips Elec. & Pharm. Indus. Corp. v. Leavens*,
  421 F.2d 39, 45 (3d Cir. 1970) .............................................................34

*U.S. ex rel. Schumann v. AstraZeneca Pharm. L.P.*,
  769 F.3d 837 (3d Cir. 2014) ...............................................................23

*Shane v. Fauver*,
  213 F.3d 113 (3d Cir. 2000) ...............................................................42

*Travelers Insurance Company v. Obusek*,
  72 F.3d 1148 (3d Cir. 1995) ...............................................................37

**State Cases**

*Atlantic Richfield Co. v. Razumic*,
  390 A.2d 736 (Pa. 1978)......................................................................34

*Hill v. Heritage Res., Inc.*,
  964 S.W.2d 89 (Tex. Ct. App. 1997).................................................. 7-8

*Tawes v. Barnes*,
  340 S.W.3d 419 (Tex. 2011) .................................................................7

**Federal Statutes**

28 U.S.C. § 1291 ...................................................................................6

28 U.S.C. § 1332(a) ..............................................................................5

**Rules**

Third Circuit Rule 28.1(a)(2) ................................................................4

Federal Rule of Appellate Procedure 60(b) ..........................................6

# INTRODUCTION

The parties in this case are natural gas companies with shared holdings in Pennsylvania.  To jointly develop these holdings, Epsilon, Chesapeake Appalachia, LLC ("Chesapeake"), and several other companies (the "JOA Parties") used an industry standard form to create Operating Agreements ("JOAs").  In creating the JOAs, the JOA Parties modified a key term of the model form that addresses how to approach work in which not all the parties agree to participate.

The model form states that, if a party declines to participate in any proposal, the proposing party can nevertheless proceed so long as it commences the proposed operation within 90 days.  However, the JOA Parties modified this sentence so that it now addresses only projects that "Rework, Sidetrack, Deepen, Recomplete, or Plug Back" an existing well.[1]  In other words, the JOA Parties excluded the drilling of new wells from that sentence.

Chesapeake and Epsilon have disputed the meaning of that modification since 2018.  Epsilon proposed the drilling of several new wells.  Chesapeake declined to participate and took the position that it could unilaterally "veto" new wells.  Epsilon

---

[1] Article VI.2(a) states: "If any party to whom such notice to Rework, Sidetrack, Deepen, Recomplete or Plug Back is delivered . . . elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this Article, the party or parties giving the notice and such other parties as shall elect to participate in the operation shall, no later than ninety (90) days after the expiration of the notice period . . . actually commence the proposed operation."  Appx121.

contended that the modification to the JOAs simply means that drilling new wells are not subject to the 90-day deadline.  Instead, as laid out in another provision of the agreements, the JOA Parties must identify a commencement date for drilling each new well.

Eventually Epsilon sued, seeking declaratory judgment and specific performance under the JOAs.  Chesapeake moved to dismiss.  Under Chesapeake's view, the JOA modification means that no drilling of a new well can proceed *at all* without unanimous participation, and alternatively, if wells *can* be drilled without unanimous participation, they must commence within 90 days.

The United States Court of Appeals for the Middle District of Pennsylvania (the "District Court") first concluded that the JOAs are ambiguous about whether drilling new wells requires unanimous agreement.  But the District Court then ruled that even if new wells can be drilled without unanimous participation, they *unambiguously* must commence within 90 days.  Because Epsilon had announced commencement dates for its disputed wells that were outside the 90-day period, the District Court dismissed Epsilon's complaint for declaratory judgment and specific performance.

The District Court erred.  As a matter of contract interpretation, the court wrongly held that the 90-day deadline applies to new wells, even though the JOAs were specifically modified to exclude new wells from that sentence.  In effect, the

District Court ruled that the JOAs meant exactly the same thing as they had before the parties modified them, and meant that *unambiguously*.

Even apart from that problem, there are several reasons to read the JOAs as excluding non-unanimous new wells from the 90-day deadline (as opposed to excluding them from being drilled altogether).

First, several other provisions of the JOAs address new wells drilled without unanimous participation. One even mentions new wells drilled without Chesapeake's participation specifically. *See* Appx122 at Article VI.2(b) (addressing what happens if the "Operator" — here, Chesapeake — "did not conduct the operation"). Given that it is clear non-unanimous new wells can exist under the agreement, the most natural reading of the modified sentence is to exempt new wells from the 90-day commencement deadline.

Second, Epsilon's reading also fits the JOAs because, in another provision written by the JOA Parties, proposals to drill new wells must provide a commencement date. Thus, it makes good sense that new wells are excluded from the 90-day rule, because a later provision governs their timing.

Third, the course of performance strongly favors Epsilon. Under the JOAs, Chesapeake itself has proposed wells with commencement dates outside of the 90-day window. The District Court wrongly brushed this course-of-performance evidence aside, saying it was contrary to the unambiguous language of the JOAs.

Ultimately the District Court erred by dismissing Epsilon's complaint. The best reading of the unmodified JOAs is that the 90-day commencement deadline does not apply to new wells. At minimum, the JOAs are ambiguous on this point and warrant further evidence and determination by the factfinder.

Independently, the District Court erred by dismissing Epsilon's declaratory judgment claim and by refusing leave to amend. Epsilon's requested declaration was not limited to its proposals to drill specific wells. Instead, Epsilon sought a more general declaration regarding Epsilon's right to drill *any* new well in which Chesapeake declines to participate.

Even if the District Court read the complaint differently, it should have afforded Epsilon leave to plead a more general claim for declaratory relief. On reconsideration, the District Court admitted that Epsilon *could* plead a general claim for declaratory judgment that is not tied to any specific new well proposal. But the court still refused to allow amendment. That was an error.

## <u>STATEMENT OF RELATED CASES</u>

In accordance with Third Circuit Rule 28.1(a)(2), Epsilon states that this proceeding has not previously been before the United States Court of Appeals for the Third Circuit. Epsilon is not aware of any other case or proceeding that is in any way related, completed, pending, or about to be presented to this Court.

However, Epsilon and Chesapeake were previously involved in the following related lawsuits filed in the District Court: (1) *Epsilon Energy USA, Inc. v. Chesapeake Appalachia, LLC* at Docket No. 3:18-cv-1852 and (2) *Epsilon Energy USA, Inc. v. Chesapeake Appalachia, LLC* at Docket No. 1:21-cv-433. The parties are currently involved in a related lawsuit pending in the District Court styled as *Epsilon Energy USA, Inc. v. Chesapeake Appalachia, LLC*, No. 3:22-cv-00679.

In addition, Chesapeake and an affiliate of Epsilon are currently involved in related lawsuits pending before the Environmental Hearing Board of the Commonwealth of Pennsylvania. Those matters include (1) cases consolidated at *Chesapeake Appalachia, LLC v. Commonwealth of Pennsylvania, Department of Environment Protection,* EHB Docket No. 2021-032-R, (2) *Chesapeake Appalachia, LLC v. Commonwealth of Pennsylvania, Department of Environment Protection,* EHB Docket No. 2021-037-R, and (3) *Epsilon Operating LLC v. Commonwealth of Pennsylvania, Department of Environment Protection and Chesapeake Appalachia, LLC*, EHB Docket No. 2022-002-R.

## STATEMENT OF JURISDICTION

The District Court had diversity jurisdiction under 28 U.S.C. § 1332(a) because Epsilon is an Ohio corporation with its principal place of business in Texas and Chesapeake is an Oklahoma limited liability company with its principal place of business in Oklahoma.

5

The District Court dismissed Epsilon's lawsuit without leave to amend on September 22, 2021.  ECF 121, 122.  Epsilon filed a motion for reconsideration under Rule 60(b) twelve days later.  ECF 123.  The District Court denied Epsilon's motion for reconsideration on January 18, 2022.  ECF 134.

This Court has jurisdiction under 28 U.S.C. § 1291 because the January 18th order denying reconsideration was a final decision.  Epsilon timely filed a notice of appeal on February 15, 2022.

## ISSUES PRESENTED

1.    Did the District Court err as a matter of contract interpretation in ruling that the JOAs' 90-day commencement deadline unambiguously governs proposals to drill new wells?

> Raised:  Raised in the Brief in Opposition to Defendant's Motion to Dismiss Amended Complaint.  *See* ECF 111.

> Ruled Upon:  Memorandum and Order.  *See* Appx0020-0026.

2.    Did the District Court err by concluding that Epsilon's complaint was limited to seeking declaratory judgment only as to the specific well proposals Epsilon had issued?

> Raised:  Raised in the Brief in Opposition to Defendant's Motion to Dismiss Amended Complaint (ECF 111), Memorandum of Law in Support of Motion for Reconsideration of Claim for Declaratory Judgment (ECF 124), and Reply Brief in Support of Motion for Reconsideration of Dismissal of Claim for Declaratory Judgment (ECF 126).

6

Ruled Upon: Memorandum and Order. *See* Appx0001-0028, Appx0043-0046.

3.    Did the District Court err by dismissing Epsilon's complaint without leave to amend, even though the court recognized that Epsilon could amend in a way that would state a claim?

Raised: Raised in the Brief in Opposition to Defendant's Motion to Dismiss Amended Complaint (ECF 111), Memorandum of Law in Support of Motion for Reconsideration of Claim for Declaratory Judgment (ECF 124), and Reply Brief in Support of Motion for Reconsideration of Dismissal of Claim for Declaratory Judgment. ECF 126.

Ruled Upon: Memorandum and Order. *See* Appx0026-0028, Appx0046-0047.

## STATEMENT OF THE CASE

This case involves a preprinted form agreement created by the American Association of Petroleum Landmen.  The form agreement is known as A.A.P.L. Form 610 – Model Form Operating Agreement – 1989 (the "Model Form").  *See* ECF 104-1 through 104-4.  The Model Form was designed to enable oil and gas producers to combine and jointly develop their assets within a prescribed geographical area.  *See Hill v. Heritage Res., Inc.*, 964 S.W.2d 89, 110 (Tex. Ct. App. 1997).  "A single party is appointed 'operator' who is responsible for the management and control of drilling, development, and production activities." *Id.; see also Tawes v. Barnes*, 340 S.W.3d 419, 426 (Tex. 2011) (describing joint operating agreements).

Under these standard operating agreements, the parties who agree to participate in a particular operation are identified as the "consenting parties." The consenting parties bear all costs and risks associated with that operation. *Hill*, 964 S.W.2d at 110. Any party who declines to participate in an operation is identified as a "non-consenting party." *Id.* Non-consenting parties retain significant influence, even though they have opted out of a particular operation. They keep their right of access to the entire contract area, as well as their voting rights over the appointment and control of the operator. *Id.* at 111.

## A.     The Joint Operating Agreements

Starting in 2011, the JOA Parties contributed their oil and gas assets within defined geographic areas in Susquehanna County, Pennsylvania to jointly drill and operate natural gas wells in those areas. *See* Appx0109-0443. The JOA Parties signed four separate but substantially similar JOAs, all using the Model Form as a framework. *See* Appx109 (as an exemplar JOA). The JOA Parties selected Chesapeake to serve as the "Operator" to perform well-related operations under each of the JOAs. Appx117 at Article V.A.

The JOAs define "Consenting Party" as "a party who agrees to join in and pay its share of the cost of any operation conducted under the provisions of this agreement." Appx113 at Article I.E. In contrast, the JOAs define "Non-Consenting Party" as "a party who elects not to participate in a proposed operation." *Id.* at

Article I.J.  The JOAs define a "Non-Consent Well" as one in which "less than all parties have conducted an operation."  *Id.* at Article I.I.

### 1.    Proposals to Conduct Operations Under the JOAs

The operations that the JOA Parties can conduct under the JOAs include drilling new wells and working on existing wells.  *Id.* at Article VI.1, Appx0120-0121.  In particular, the JOA Parties can "Rework, Sidetrack, Deepen, Recomplete, or Plug Back" an existing well.  *Id.*  Although Chesapeake serves as the Operator, any JOA Party can submit a written notice proposing to undertake any of the operations permitted under the JOAs.  Appx0120-121, Appx0138-0139 at Articles VI.1 and XVI.

Upon receipt of a written proposal, the other JOA Parties have 30 days to elect whether they will participate in the operation.  Appx0120-0121 at Article VI.1.  Any party that does not respond within the 30-day election period is deemed to have declined to participate.  *Id.*

### 2.    Operations Involving Less Than All JOA Parties

Article VI.2 of the JOAs governs operations on Non-Consent Wells in which at least one JOA Party has declined to participate.  That Article spans three pages in each JOA and includes four subsections identified as (a) through (d).  Appx0121-0124.

The first sentence in Article VI.2(a) of the Model Form states that, if any JOA Party elects not to participate in an operation, the other parties must begin that operation within 90 days after the notice period expires.  Appx121.

During their negotiations, the JOA Parties modified this sentence of the Model Form.  *Id.*  The JOA Parties inserted "to Rework, Sidetrack, Deepen, Recomplete, or Plug Back."  *Id.*  This modification excludes the drilling of a new well from this first sentence, which now reads:

> If any party to whom such notice to Rework, Sidetrack, Deepen, Recomplete or Plug Back is delivered . . . elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this Article, the party or parties giving the notice and such other parties as shall elect to participate in the operation shall, no later than ninety (90) days after the expiration of the notice period . . . actually commence the proposed operation.

*Id.*

Article VI.2(a) then describes how the proposing party should proceed with a Non-Consent Well.  *Id.*  The proposing party must notify the other Consenting Parties of the working interests consenting and whether the proposing party recommends proceeding with the proposed operation despite the lack of unanimous participation.  *Id.*  Because Non-Consenting Parties do not fund the operation in which they decline to participate, the Consenting Parties must agree to contribute the funds that the Non-Consenting Parties would have provided had they consented to participate.  *Id.*

10

In addition, Article VI.2(a) addresses the protocol if Chesapeake declines to participate in a proposed operation. *Id.* The JOAs state that one of the Consenting Parties can perform the operation in which Chesapeake has declined to participate:

> Operator shall perform all work for the account of the Consenting Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is a Non-Consenting Party, the Consenting Parties shall either: (i) request Operator to perform the work required by such proposed operation for the account of the Consenting Parties, or (ii) designate one of the Consenting Parties as Operator to perform such work. The rights and duties granted to and imposed upon the Operator under this agreement are granted to and imposed upon the party designated as Operator for an operation in which the original Operator is a Non-Consenting Party.

*Id.*

However, the Consenting Party who performs a successful operation must turn that Non-Consent Well back over to Chesapeake when the operation is complete. Appx122 at Article VI.2(b). Article VI.2(b) states that "the well shall then be turned over to Operator (if the Operator did not conduct the operation) and shall be operated by it at the expense and for the account of the Consenting Parties." *Id.*

### 3.    Proposals to Drill New Wells

While Article VI.1 addresses the general procedure for submitting proposals to conduct operations under the JOAs, Article XVI sets forth the specific requirements for submitting proposals to drill new wells. Appx0138-0139. This Article, entitled "Other Provisions," is the last Article in the Model Form, and is the

place where parties can insert their own unique language. *See id.* In other words, Article XVI is customized language that the JOA Parties crafted and inserted into their JOAs. *Id.*

Article XVI requires that proposals to drill new wells contain certain additional information that is not required for proposals to perform operations on existing wells. *See id.* at Article XVI.A(1)(a) and (2)(a). The JOA Parties agreed in the customized Article XVI that proposals to drill new wells must include the commencement date for the drilling of the new well. *Id.* In addition, the JOAs state that the customized language in Article XVI is controlling if it conflicts with any other provisions in the JOAs. Appx141 at Article XVI.N.

**B.    The Settlement Agreement Resolving Prior Litigation**

In September 2018, a dispute arose regarding the interpretation of the JOAs that led Epsilon to file suit against Chesapeake in the District Court. Appx72 at ¶ 37. Epsilon alleged that Chesapeake failed to adhere to the JOAs to thwart Epsilon's efforts to drill new wells. *Id.* at ¶ 38.

The parties settled the prior lawsuit before an injunction hearing occurred. Appx73 at ¶ 41. In the Settlement Agreement and Release dated October 8, 2018 (the "Settlement Agreement"), Chesapeake acknowledged that "Epsilon may propose wells under all of the JOAs between them, in accordance with the terms of the JOAs . . ." Appx447 at ¶ 8. With respect to new wells that Epsilon might

propose, Chesapeake further agreed that:

> If [Chesapeake] does not consent to a proposal and will not act as the operator of that proposal, [Chesapeake] will cooperate with the party designated, to the extent permitted under the JOA, as operator, and will not unreasonably withhold cooperation, including but not limited to, permitting and access to co-owned assets, such as water withdrawal points and impoundments.

*Id.* at ¶ 8(d).  In exchange, Epsilon agreed to refrain from proposing new wells until 2020 so that Chesapeake could drill the new wells that it preferred to drill in the interim.  Appx0446-0447 at ¶¶ 3-5, 8.

## C.     The Current Litigation Involving Epsilon's Rights Under the JOAs and Settlement Agreement

After waiting its turn under the Settlement Agreement, Epsilon identified several new wells that it desired to drill in the areas governed by the JOAs.  Appx81, 461.  Epsilon advised Chesapeake of its desire to drill wells on an existing well pad known as the "Craige Well Pad."  Appx0082-0084 at ¶¶ 79-91.  When it became apparent that Chesapeake was not interested in proceeding with these wells, Epsilon formally proposed the drilling of four new wells on the Craige Well Pad.  Appx84 at ¶ 92.  Epsilon sent the notices with the four proposals to the other JOA Parties on December 22, 2020.  *Id.*

Two other JOA Parties elected to participate in one of the four wells that Epsilon proposed.  Appx85 at ¶ 96.  None of the other JOA Parties elected to participate in the other three proposed wells.  *Id.* at ¶ 97.  Chesapeake elected to not

participate in any of the four wells and declined to serve as the Operator to drill the wells.  Appx0085-0086 at ¶ 98.  When the 30-day election period under the JOAs expired, Epsilon notified the JOA Parties that it had received 100% subscription and intended to proceed with all four of the wells.  Appx87 at ¶ 102.

Epsilon sought Chesapeake's cooperation as required by the JOAs and Settlement Agreement so that Epsilon could proceed with its proposed wells. Appx0087-0088 at ¶¶ 103-06.  However, Chesapeake responded by raising the same argument that it had asserted in the prior lawsuit: that the JOAs require unanimous participation of all JOA Parties to drill a new well.  *Id.*  Chesapeake once again alleged that it could unilaterally "veto" Epsilon's proposals to drill new wells by declining to participate in those wells.  *See id.*

### 1.    The Complaint and Motion for Preliminary Injunction

Epsilon filed this lawsuit in April 2021 seeking to obtain declaratory relief and specific performance.  ECF 1.  Epsilon sought a declaration that if Chesapeake declines to participate in a new proposed well, then Chesapeake must reasonably cooperate so that Epsilon (or one of the other Consenting Parties) can drill that well. *Id.* at ¶¶ 108-117.

Along with its complaint, Epsilon filed a motion for preliminary injunction in an attempt to comply with the announced commencement dates for the drilling that Epsilon had included in its December 2020 proposals.  ECF 5.  The District Court

denied Epsilon's motion for preliminary injunction.  ECF 80-81.  Although the District Court rejected Chesapeake's contention that Epsilon had not asserted a viable claim for declaratory relief, it concluded that the proposals Epsilon issued in December 2020 had expired.  For that reason, the District Court ruled that Epsilon's request for a preliminary injunction was moot.  *Id.*

### 2.    The Amended Complaint

Epsilon submitted new proposals on May 25, 2021 seeking to drill the same four wells on the Craige Well Pad.  Appx590.  Under Article XVI of the JOAs, Epsilon proposed commencement dates in October and November 2021 for these wells.  *Id.*

After providing notice of its new proposals, Epsilon obtained leave of court to amend its complaint to address the new proposals and clarify certain issues that had arisen during the preliminary injunction proceeding.  Appx0065-0108.  Epsilon noted in its Amended Complaint that it had submitted two separate sets of proposals to drill the four new wells on the Craige Well Pad:  a first set in December 2020 and, after the District Court ruled that those proposals had expired, a second set in May 2021.  Appx84, 94 at ¶¶ 92, 128-29.

In Count I of the Amended Complaint, Epsilon again sought declaratory relief.  Appx0096-0099 at Count I.  The requested relief included declarations that, if Chesapeake declines to participate in a new well that Epsilon has proposed, then

Epsilon has the right to drill the proposed well. Appx0098-0099 at Count I, Wherefore Clause (1). Epsilon also sought a declaration that Chesapeake has an obligation to allow Epsilon access to drill the new well in which Chesapeake has declined to participate. *Id.* at Count I, Wherefore Clause (2). In Counts II and III, Epsilon sought specific performance under the Settlement Agreement and JOAs so that it could drill the four proposed wells on the Craige Well Pad. Appx0099-0104 at Counts II and III.

### 3.    The Motion to Dismiss the Amended Complaint

On July 16, 2021, Chesapeake moved to dismiss the Amended Complaint. ECF 109-10. Chesapeake argued that by modifying the Model Form to exclude "drilling" from the first sentence in Article VI.2(a), the JOA Parties intended to exclude the drilling of new wells from the operations that can be conducted without unanimous participation. ECF 110 at 13-14.

Alternatively, Chesapeake argued that Epsilon's proposals in May 2021 did not comply with the JOAs. *Id.* at 10–11. Chesapeake argued that the 90-day commencement deadline in Article VI.2(a) applied to Epsilon's proposals to drill new wells on the Craige Well Pad. *Id.* Because Epsilon's proposals included commencement dates that were more than 90 days after the close of the election period, Chesapeake argued that Epsilon was "non-compliant" with the JOAs and had "failed to satisfy a condition precedent." *Id.* at 10-11.

16

In opposing the motion to dismiss, Epsilon argued that the modification to the Model Form did not remove the drilling of new wells from the operations that can be performed without unanimous participation. ECF 111 at 12-16. Epsilon cited provisions throughout the JOAs that make clear that Consenting Parties can drill a new well even if other JOA Parties (including Chesapeake) decline to participate. *Id.* at 13-15.

Instead, Epsilon argued that removing "drilling" from the first sentence of Article VI.2(a) exempted the drilling of new wells from the 90-day deadline referenced in that second part of that sentence. *Id.* at 12-13. Epsilon argued that the JOAs permitted Epsilon to select commencement dates in its May 2021 proposals that were more than 90 days after the close of the election period. *Id.*

### 4.    The Dismissal of the Amended Complaint

On September 22, 2021, the District Court granted Chesapeake's motion and dismissed the Amended Complaint without leave to amend. Appx0001-0028. The District Court concluded that the JOAs are ambiguous with respect to whether unanimous consent of all JOA Parties (including Chesapeake) is required to drill a new well. On one hand, the District Court concluded that Chesapeake's "reading of Article VI.2(a) is reasonable because the first sentence of Article VI.2(a) seems to specifically limit its scope to situations in which a party has proposed work 'to Rework, Sidetrack, Deepen, Recomplete or Plug Back' an existing well. (JOAs, Art.

VI.2(a).)"  Appx15.  On the other hand, the District Court concluded that Epsilon's interpretation is reasonable because Article VI.2(b) "clearly contemplates situations in which a drilling operation is completed without the operator conducting the operation."  Appx17.

However, the District Court then concluded that, assuming well-drilling can proceed without unanimous consent, the 90-day commencement deadline unambiguously applies to proposals to drill new wells.  The District Court did not consider the 90-day deadline in Article VI.2(a) inconsistent with Article XVI's requirement that proposals to drill new wells include commencement dates. Appx0022-0023.  While the District Court acknowledged that Chesapeake had submitted multiple proposals containing commencement dates that were more than 90 days after the election period expired, the District Court nevertheless held that Chesapeake's course of conduct did not matter because the contract was unambiguous in imposing the 90-day deadline.  Appx0024-0025.

In dismissing the Amended Complaint without leave to amend, the District Court explained that "Epsilon's currently operative proposals for the drilling of new wells do not comply with the timing requirements of Article VI.2(a), so any amended complaint would not withstand a renewed motion to dismiss."  Appx26.  But the District Court further clarified: "The court emphasizes, however, that while it is dismissing the amended complaint without further leave to amend, this decision is

without prejudice to Epsilon's right to file a new lawsuit based on new proposals made after this opinion." *Id.*

### 5.    The Motion for Reconsideration

Epsilon moved for reconsideration. *See* ECF 123-24. In that motion, Epsilon emphasized that its request for declaratory relief to interpret its rights under the JOAs and Settlement Agreement was not dependent upon the specific proposals that Epsilon submitted in May 2021. ECF 124 at 2-3, 8-10.

The District Court denied the reconsideration motion in January 2022. Appx0029-0048. Importantly, the District Court retreated from its implication that Epsilon needed to submit new proposals to pursue a claim for declaratory relief. Appx44 (noting that "Epsilon is correct that it could have proceeded with a declaratory judgment claim based on the language of the JOAs generally . . ."). However, the District Court concluded that Epsilon did not include a "general" request for declaratory relief to interpret the JOAs in the Amended Complaint. *Id.* The District Court again interpreted Epsilon's request for declaratory relief as limited to the specific proposals that Epsilon submitted in May 2021. *Id.*

Epsilon timely appealed.

### <u>SUMMARY OF THE ARGUMENT</u>

In rejecting Chesapeake's argument that the modification to the Model Form evidences the JOA Parties' intent to require unanimous participation to drill a new

well, the District Court concluded that the modification is ambiguous. The District Court agreed with Epsilon that other JOA provisions state that Consenting Parties can drill a new well if one or more Non-Consenting Parties have declined to participate in that new well. This concession necessarily means that Epsilon's alternative explanation for the modification — namely, to exempt the drilling of new wells from the 90-day commencement deadline that would otherwise apply — is reasonable. However, the District Court inexplicably ruled that the 90-day deadline would unambiguously apply to the drilling of new wells if such wells can proceed without unanimous participation. This illogical ruling is erroneous for several reasons.

First, the ruling is inherently inconsistent. The District Court found the first sentence to be ambiguous because both Chesapeake and Epsilon offered reasonable interpretations of that sentence. However, the District Court then suggested that the very same sentence is unambiguous (and rejected Epsilon's interpretation of the sentence as a matter of law). The first sentence in Article VI.2(a) is either ambiguous or unambiguous but cannot be both.

Second, the modified sentence regarding the 90-day commencement deadline does not clearly apply to the drilling of new wells. While the Model Form applies that deadline to all operations conducted under the JOAs, the parties modified their JOAs by identifying work performed on *existing* wells as the operations subject to

that deadline.  It is reasonable to conclude that the modification was intended to exempt the drilling of new wells from the 90-day commencement deadline.

Third, the fact that the parties customized Article XVI to require a party proposing to drill a new well to set forth the commencement date in its written proposal — a requirement that does not exist for proposals to perform work on existing wells — also suggests that the 90-day deadline does not apply to new wells. If the JOA Parties intended the 90-day commencement deadline to apply to all operations, then there would be no need to treat proposals to drill new wells differently by requiring a commencement date in those proposals.

Finally, in its own proposals to drill new wells, Chesapeake included commencement dates that exceeded the 90-day deadline that it now claims to apply to new wells.  Chesapeake's course of performance confirms that the JOAs are ambiguous (at the absolute minimum).

Based on its mistaken conclusion that the 90-day commencement deadline unambiguously applies to the drilling of new wells, the District Court (1) concluded that Epsilon's proposals in May 2021 were "invalid" and (2) dismissed the Amended Complaint without leave to amend.  The dismissal was misguided.  On its face, Epsilon's declaratory judgment claim was not limited to its May 2021 proposals. Epsilon also sought declaratory relief regarding its rights under the JOAs if

Chesapeake declines to participate in any proposal that Epsilon issues to drill a new well.

While the District Court misinterpreted the Amended Complaint to seek a limited declaration regarding the May 2021 proposals, it conceded that Epsilon could have pled a more "general" declaratory judgment claim regarding its rights under the JOAs. The District Court committed reversible error by dismissing without leave to amend after conceding that amendment was possible.

## STANDARD OF REVIEW

A district court's order granting a motion to dismiss, including a dismissal on the basis that a contract is unambiguous, is subject to de ne novo review. *See, e.g., Brown v. Agway Energy Servs., LLC*, 822 F. Appx 100, 102 and n.2 (3d Cir. 2020) (reviewing de novo the district court's dismissal of a complaint on the basis that the contract unambiguously permitted the defendant's conduct); *Calvitti v. Anthony & Sylvan Pools Corp.*, 351 F. Appx 651, 654 (3d Cir. 2009) ("We review *de novo* the District Court's decision to grant a motion to dismiss.").

Accordingly, this Court reviews de novo the District Court's rulings that (1) the JOAs' 90-day commencement deadline unambiguously applies to the drilling of new wells and (2) the Amended Complaint did not seek "general" declaratory relief regarding Epsilon's rights under the JOAs if Chesapeake declines to participate in a well that Epsilon has proposed.

The District Court's decision not to allow Epsilon leave to amend is reviewed for abuse of discretion, but the presence or absence of futility receives de novo review. *U.S. ex rel. Schumann v. AstraZeneca Pharm. L.P.*, 769 F.3d 837, 849 (3d Cir. 2014).

## **ARGUMENT**

### A.    **The 90-Day Deadline Does Not Unambiguously Apply to the Drilling of New Wells**

The District Court ruled that the JOAs unambiguously require new proposed wells to be commenced within 90 days of the notice period.  That ruling was wrong for at least four reasons.  (1) It ignores the text of the 90-day provision, which states that it applies to well operations other than drilling.  (2) It fails to fit the language of Article XVI, which requires the JOA Parties to announce commencement dates for drilling new wells, which would not make sense if they had to fall within 90 days.  (3) It conflicts with Chesapeake's own course of performance in proposing new wells with commencement dates beyond 90 days after the notice period.  (4) It conflicts with the District Court's own ruling that the JOAs are ambiguous as to whether non-unanimous wells can be drilled at all, erasing all effect from the JOA Parties' modification to the Model Form.

Because the JOAs are at least ambiguous, the District Court should have denied the motion to dismiss. *See Chambers v. Chesapeake Appalachia, L.L.C.*, 359 F. Supp.3d 268 (M.D. Pa. 2019) (denying a motion to dismiss where both parties

offered "reasonable but conflicting interpretations" of the key clauses at issue).

1.    **The plain text of Article VI.2(a) does not apply the 90-day limit to drilling new wells**.

Interpretation begins "with the words of the contract." *Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 93 (3d Cir. 2001) (identifying the "words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning" as the way that Pennsylvania law assesses "whether ambiguity exists in a contract").

Here, the 90-day deadline comes from the following contract sentence: "If any party to whom such notice *to Rework, Sidetrack, Deepen, Recomplete, or Plug Back* is delivered . . . elects not to participate in the proposed operation, then, . . . the party or parties giving the notice . . . shall, no later than ninety (90) days after the expiration of the notice period . . . actually commence the proposed operation." Appx121 (emphasis in original).  As a matter of plain text, this provision does not say that drilling a new well should occur within 90 days.  The District Court's opinion does not address the plain text in the part of its analysis relevant here.  *See* Appx0020-0026 (finding that the 90-day limit unambiguously applies to drilling new wells).

On its face, the first sentence of Article VI.2(a) in the Model Form is an "if/then" clause that imposes a condition upon the ability to conduct operations without unanimous participation.  The sentence states that operations can be

24

conducted without unanimous participation under Article VI.2 only if they are commenced within 90 days after the election period expires.

Under the Model Form, all operations — including the drilling of new wells — are subject to the 90-day deadline. In modifying the Model Form, the JOA Parties retained the 90-day commencement deadline but made it apply only to operations conducted on existing wells. By excluding the drilling of a new well from that sentence, the JOAs carve the drilling of new wells out of the condition that requires commencement of operations within 90 days. At minimum, the plain text shows that this provision does not *unambiguously* apply the 90-day deadline to the drilling of new wells, which it does not mention (and carves out).

An analogy shows the reasonableness of Epsilon's interpretation. A form agreement to rent a bicycle states that "all minors must wear a helmet in order to ride the bike." The parties then modify that term to add "under the age of 15" so that the new phrase is "all minors under the age of 15 must wear a helmet in order to ride." The best interpretation of the new phrase is that the parties intended to remove a condition (wearing a helmet) from a subset of minors (those 15 and over). It would be absurd to conclude the inserted language was intended to prevent minors 15 and over from riding the bike at all.

Here, the first sentence in the Model Form's version of Article VI.2(a) imposes a condition upon the right to conduct any operation with fewer than all JOA Parties:

the operation must commence within 90 days.  The language the JOA Parties inserted narrowed the object of the condition so that it applies only to various types of work on existing wells.  By removing drilling a new well from the scope of the provision that sets up the 90-day limit, the JOA Parties intended to make it *easier* to drill a new well without unanimous participation.

### 2.    The District Court's ruling would eliminate the modification made to the Model Form.

The District Court's interpretation would render meaningless the modification that the JOA Parties made to the Model Form.  Such an interpretation runs counter to the "well-established principle of contract construction that a contract should be read so as to give meaning to all of its terms."  *Bohler-Uddeholm*, 247 F.3d at 97.

The Model Form, unmodified, allowed both the drilling of new wells and work on existing wells without unanimous consent, but set a deadline of 90 days for the commencement of any of that work.

But the JOA Parties narrowed the Model Form.  After the word "notice," they added the modifiers "to Rework, Sidetrack, Deepen, Recomplete, or Plug Back," yet did not add any mention of drilling new wells.  Thus, all should agree, the JOA Parties excluded the drilling of new wells from that sentence.

In Chesapeake's view, that change excluded the drilling of new wells *entirely* from that entire article of the contract (Article VI.2), meaning that no well can be drilled at all without unanimous participation.  In Epsilon's view, the change simply

excludes new wells from the 90-day limit, while the JOAs still allow wells to be drilled without unanimous participation.

But in the District Court's view, the new language changed nothing at all. The District Court adopted an interpretation in which the original Model Form and the modified JOAs have the exact same meaning.

Narrowing the universe of drilling, reworking, sidetracking, deepening, recompleting, and plugging back to exclude drilling must have been meant to treat drilling new wells differently than conducting operations on existing wells in some fashion. Yet the District Court ruled that the JOAs unambiguously apply the same 90-day deadline to both drilling and conducting operations on existing wells. That ruling does not make sense. It leaves the modification with no effect at all. The JOA Parties consciously changed the Model Form, as all have acknowledged. It cannot be that the change was meant to carry no effect at all.

### 3.    The rest of Article VI favors Epsilon's interpretation by making clear that wells can be drilled without unanimous consent.

Once it is clear the District Court erred because the modification to the Model Form must mean *something*, the question is what it means. The rest of the JOAs' provisions strongly favor Epsilon's interpretation.

Pennsylvania law requires courts to "look to the contract as a whole for guidance in interpreting a term in the contract." *Bohler-Uddeholm*, 247 F.3d at 97 (concluding after analyzing all of the contract that its disputed term was ambiguous);

*see also Pacific Employers Ins. Co. v. Global Reinsurance Corp. of Am.*, 693 F.3d 417, 426 (3d Cir. 2012) ("When determining whether a contract is ambiguous, we must 'examine the entire contract' and '[p]articular words should be considered, not as if isolated from the context, but [rather,] in the light of the obligation as a whole and the intention of the parties as manifested thereby.'")

Here, many JOA provisions refer to drilling new wells without unanimous participation. That fact creates a strong inference that the modification in the first sentence of Article VI.2(a) means to exclude drilling from the 90-day deadline, not exclude drilling from being able to occur at all without unanimous participation.

For instance, Article VI.2(b) repeatedly references drilling new wells without unanimous participation, including:

> If any well *drilled*, Reworked, Sidetracked, Deepened, Recompleted, or Plugged Back under the provisions of this Article results in a well capable of producing Oil and/or Gas in paying quantities, the *Consenting Parties* shall complete and equip the well to produce at their sole cost and risk, and then turned over to the Operator (*if the Operator did not conduct the operation*) and shall be operated by it at the expense and for the account of the Consenting Parties.

Appx122 (emphasis added). This provision establishes that, in the drilling of new wells, there can be Consenting Parties and Non-Consenting Parties. It also reflects that a well could be drilled by a company other than the Operator, which would only happen if the Operator did not consent.

Other provisions also clearly envision wells drilled without unanimous consent:

- Article VI.2(c) indicates that a party that did not consent to the drilling of a new well is deemed to have elected not to participate in any subsequent proposal to rework or plug back that well.

- Article VI.2(d) requires the party that completed an operation for the Consenting Parties to promptly furnish the Non-Consenting Parties with (among other information) an itemized statement of the "cost of drilling" the new well.

- Article VI.4 addresses the manner in which a party that elected not to participate in the drilling of a new well can participate in a proposal to deepen that well. In particular, the Non-Consenting Party must reimburse the Consenting Parties for the pro rata share that it would have paid for drilling that well had it participated.

- Article VI.5 addresses the manner in which a party that elected not to participate in the drilling of a new well can participate in a proposal to sidetrack that well.

ECF 111 at 13-15; *see also* Appx0123-0125. These provisions, read together, support Epsilon's interpretation that the JOAs allow wells to be drilled without unanimous participation. Thus, Article VI.2(a) is best understood as excluding non-unanimous new wells from the 90-day limit, not excluding them from occurring altogether.

### 4. Article XVI further supports Epsilon's view by requiring proposals to drill a new well to include a commencement date.

Article XVI also supports Epsilon's interpretation. In Article XVI, the JOA Parties modified the Model Form to state that, unlike proposals to perform

operations on existing wells, proposals to drill new wells must set forth the commencement date on which drilling the new well would begin.  If the JOA Parties had intended the 90-day commencement deadline in Article VI.2(a) to apply to the drilling of new wells, then there would be no reason for a proposal to drill a new well to include a commencement date.  Reading Article VI.2(a) together with Article XVI suggests that the JOA Parties intended for the drilling of new wells to have a different commencement deadline than the 90-day deadline applicable to operations on existing wells.

In rejecting this argument, the District Court misconstrued Epsilon's argument and the applicable law.  The District Court "reject[ed] Epsilon's argument that Article XVI and Article VI are in conflict with one another."  Appx22.  The District Court added that "[t]he two provisions can both be honored at the same time by proposing a commencement date within 90 days after the expiration of the notice period.  Thus, there is no conflict."  *Id.*

But the law does not require a "conflict" between the provisions.  Epsilon's point here is simpler.  None of the various types of work that can be done on existing wells require the parties to identify any commencement date.  The 90-day limit governs them.  But under Epsilon's proper reading of the JOAs, drilling a new well is excluded from the 90-day limit.  Under that reading, it makes perfect sense that Article XVI addresses the timing for a new well — it requires the proposing party

to identify a commencement date.  Put differently, if the parties intended the 90-day commencement deadline to apply to new wells, there would be no reason to distinguish proposals for new wells by adding the additional requirement that they contain a commencement date.  The commencement date set forth in the proposal to drill a new well would be unnecessary and confusing.

That the District Court managed to avoid "conflict" under a contrary reading of the contract does not matter.  And it does not change that the more natural reading favors Epsilon's view.

For instance, in *Bohler-Uddeholm*, this Court addressed an analogous contract dispute.  In an extensive analysis, the Court concluded that a series of contract provisions, read together, reasonably presented the interpretations of both sides, such that the contract was ambiguous and the interpretive issue was properly for the jury. *Bohler-Uddeholm*, 247 F.3d at 97-98.  The Court analyzed arguments about which reading of the provisions was the "most natural."  *Id.*  It did not require the party trying to show ambiguity to prove *conflict* between provisions under the other party's view.  Instead, the Court merely noted the proffered provisions were consistent with — and thus rendered reasonable — the party's interpretation, and suggested at least ambiguity in the contract.  *Id.*

That same line of reasoning applies here.  Epsilon offers a reasonable interpretation of the interplay between Articles VI.2(a) and Article XVI.  Because a

Consenting Party's preparation to drill new wells can take far more time than the preparation to begin work on existing wells, a logical reason exists for exempting new wells from the 90-day deadline set forth in Article VI.2 in the Model Form. *See* ECF 111 at 7. Epsilon had previously proffered an expert opinion on industry custom in the injunction proceedings. The expert opined that it is common in the industry for parties to modify the Model Form to afford extra time to commence operations on a new well. *See* ECF 111 at 7 n.3. The District Court erred by rejecting an interpretation that reconciled both articles in this "most natural" fashion. *Bohler-Uddeholm*, 247 F.3d at 98.

In short, the question that the District Court should have asked is not whether those articles conflict with one another under Chesapeake's view. The question is whether Article XVI's requirement that a proposal to drill a new well must include a commencement date is consistent with, and demonstrates the reasonableness of, *Epsilon's position* that the 90-day commencement deadline in Article VI.2(a) does not apply to new wells. The District Court's rejection of Epsilon's interpretation on the basis that the two provisions are "not in conflict" and can "both be satisfied" under an alternative reading was erroneous.

### 5.    Chesapeake's course of performance under the JOAs and Settlement Agreement confirms Epsilon's view.

Last, the parties' course of performance strongly supports Epsilon's view that the 90-day limit does not apply to drilling new wells.

In particular, Chesapeake's course of conduct after signing the JOAs supports Epsilon's interpretation that the purpose for modifying the Model Form was to exempt new wells from the 90-day commencement deadline that would have otherwise applied. When Chesapeake proposed the drilling of new wells under the JOAs, it included commencement dates in its own proposals that were more than 90 days after the expiration of the election period. *See* Appx0094-0095 at ¶ 131 (alleging that Chesapeake "has proposed the drilling of new wells under the JOAs in which the deadlines to commence operations set forth in the well proposals were greater than 120 days from the dates of the proposals").

Further, Chesapeake has drilled new wells that it had proposed even though other JOA Parties did not consent to participate in those wells. Appx0095-0096 at ¶¶ 132-43 (identifying three wells that Chesapeake drilled without unanimous participation, including one in which Epsilon had declined to participate).

Finally, Chesapeake stated in the Settlement Agreement that if it declined to participate in a well that Epsilon had proposed, Chesapeake would still "cooperate with the party designated, to the extent permitted under the JOA, as operator, and will not unreasonably withhold cooperation." Appx447 at ¶¶ 8(a), 8(d).

Chesapeake's own conduct therefore suggests that the JOAs do not require unanimous participation to drill new wells. Instead, Chesapeake's conduct is consistent with Epsilon's position that they modified the Model Form to exclude the

drilling of new wells from the 90-day commencement deadline. At an absolute minimum, the course of performance evidence creates an ambiguity as to the applicability of the 90-day deadline to the drilling of new wells.

The District Court rejected course of performance as irrelevant. Appx25 ("when parties have erroneously performed in a way that contradicts the plain language of the contract, the court should not perpetuate the error"). The District Court refused to use course of performance evidence as part of its analysis whether the JOAs were ambiguous. Instead, it ruled that it had already found the JOAs unambiguous, and thus, course of performance did not matter. *Id.*

The District Court erred, for several reasons. First, both the Pennsylvania Supreme Court and this Court have recognized that course of performance is powerful evidence of what meaning the parties ascribed to their contract. *See Atlantic Richfield Co. v. Razumic*, 390 A.2d 736, 741 (Pa. 1978) (calling "course of performance" "perhaps the *strongest indication* of what the writing means"); *Philips Elec. & Pharm. Indus. Corp. v. Leavens*, 421 F.2d 39, 45 (3d Cir. 1970) ("A well recognized principle of contract law requires that the terms of a contract be interpreted in light of the meaning which the parties themselves have attached to them as evidenced by their subsequent conduct.").

For example, in *Langer v. Monarch Life Ins. Co.*, 879 F.2d 75, 81 (3d Cir. 1989), this Court reversed summary judgment because the parties' course of

performance demonstrated that their contract was ambiguous. *Langer*, 879 F.2d at 80-82 (relying on Pennsylvania law). The plaintiff alleged that the contract required his employer to obtain disability insurance for him. *Id.* at 80. In its defense, the employer alleged the plaintiff was required to procure the disability coverage. *Id.* The dispute arose when the plaintiff became disabled before a disability policy was obtained. *Id.* at 77. In reversing summary judgment in the employer's favor, the Third Circuit emphasized that, in several letters and internal memoranda created after signing the contract, the employer "acted as though it had a duty to provided disability insurance payments" to the plaintiff. *Id.* at 81-82. The Court remanded the case for trial because the course of performance established that the contract was ambiguous. *Id.* at 83; 81 (holding that even if the contract was unambiguous on its face, "we would consider the parties' course of performance, and in light of that evidence conclude that it is latently ambiguous"). The *Langer* Court specifically noted the argument that "Pennsylvania law bars the use of extrinsic evidence to demonstrate a latent ambiguity in a contract" and held that "we simply reject its argument as a misreading of Pennsylvania law." *Id.* at n.8.

Indeed, so long as there is a "contractual hook" for a party's interpretation, it is welcome to present course of performance evidence and arguments, even to show that a contract is ambiguous. *Bohler-Uddeholm*, 247 F.3d at 93 (explaining that "latent ambiguity" can "arise from extraneous or collateral facts which make the

meaning of a written agreement uncertain although the language thereof, on its face, appears clear and unambiguous").  Here, the language in Article VI.2(a), the rest of Article VI, and Article XVI provide an ample "contractual hook" for Epsilon to present that Chesapeake itself has proposed commencement dates for non-unanimous wells more than 90 days after the notice period.

## B.     The District Court Erroneously Dismissed the Amended Complaint Without Leave to Amend

Based on its conclusion that the proposals that Epsilon submitted in May 2021 were "invalid" because they failed to comply with the 90-day commencement deadline, the District Court dismissed the Amended Complaint without leave to amend.  The District Court explained: "Epsilon's currently operative proposals for the drilling of new wells do not comply with the timing requirements of Article VI.2(a), so any amended complaint would not withstand a renewed motion to dismiss."  Appx26.  However, the District Court clarified that "this decision is without prejudice to Epsilon's right to file a new lawsuit based on new proposals made after this opinion." *Id.*

This ruling was erroneous for several independent reasons.  First, Epsilon does not need to maintain a "currently operative" proposal to drill a new well in order to seek a declaration regarding its rights under the JOAs.  Second, the Amended Complaint included a general request for declaratory relief regarding Epsilon's rights under the JOAs that was not dependent upon the validity of a specific proposal to

drill any particular well.  Third, even if the District Court disagreed that Epsilon had pled such a "general declaratory judgment action" in the Amended Complaint, Third Circuit law required the District Court to afford Epsilon leave of court to do so.

### 1.    Epsilon did not need to issue valid proposals to drill new wells in order to pursue a declaratory judgment claim.

A declaratory judgment is appropriate to prevent a threatened breach of contract.  *See, e.g., ACandS, Inc. v. Aetna Cas. & Sur. Co.*, 666 F.2d 819, 822 (3d Cir. 1981) ("The dispute between Aetna, Travelers and ACandS as to the coverage of the insurance polies is real and concrete.").  Accordingly, a plaintiff need not establish that the defendant is currently breaching the parties' contract in order to assert a declaratory judgment claim.  *Hardware Mut. Cas. Co. v. Schantz*, 178 F.2d 779, 780 (5th Cir. 1949) ("The purpose of the Declaratory Judgment Act is to settle 'actual controversies' before they ripen into violations of law or a breach of some contractual duty.").

For example, in *Travelers Insurance Company v. Obusek*, 72 F.3d 1148 (3d Cir. 1995), this Court ruled that the plaintiff did not have to allege that the defendant was currently violating a statute to obtain a declaration regarding that statute's interpretation.  *Id.* at 1154-56.  The parties disputed whether Pennsylvania's no-fault motor vehicle statute required an insurance company to pay the "attendant care services" that plaintiff required because of an automobile accident.  *Id.* at 1149-52.  While the trial court ruled on summary judgment that the insurer did not have to pay

for those services if they were provided by the plaintiff's mother, it did not decide whether the services were compensable if provided by a licensed caregiver. *Id.* at 1153. This Court concluded that the plaintiff did not have to retain a licensed caregiver for her declaratory judgment claim to ripen:

> Although the action cannot be based on a contingency, [ ] the party seeking declaratory relief need not wait until the harm has actually occurred to bring the action. [ ] Thus, in an appropriate circumstance, a litigant can seek a declaratory judgment where the harm is threatened in the future. However, the plaintiff must demonstrate that the probability of that future event occurring is real and substantial, "of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." [ ] Accordingly, a party need not decide between attempting to meet the nearly insurmountable burden of establishing that the relevant injury is a mathematical certainty to occur, nor must a party await actual injury before filing suit. Erecting such barriers would eviscerate the Declaratory Judgment Act and render the relief it was intended to provide illusory.

*Id.* at 1154 (internal citations omitted). Because the insurance company had unambiguously announced that it would not pay for attendant care services even if provided by a non-family licensed caregiver, this Court held that the plaintiff had asserted a valid claim for declaratory relief.[2]

As the above case law makes clear, Epsilon did not need to issue a valid proposal to drill a new well — and wait for Chesapeake to breach its obligations

---

[2] This Court further explained: "She needs to know whether attendant care services are an allowable expense under the No-Fault Act if they are administered by a licensed health care professional. She should not have to blindly take the step of incurring an expense that Traveler's may be legally obligated to assume before being told if she has stepped in a hole." *Id.* at 1155-56.

under the JOAs and Settlement Agreement — in order to assert a cognizable declaratory judgment claim.  Here, there is a clear threat of future harm.  Chesapeake has made clear that whenever it does not consent to any new well proposal, it will veto such proposal and will not allow Epsilon or any other JOA Party to act as the operator to proceed. The probability of this occurring is real and substantial. Since 2018, any time that Epsilon has proposed new wells, Chesapeake has thwarted those attempts and has continued to block Epsilon's access to jointly owned resources. Even now, when Epsilon does not have active well proposals, Chesapeake continues to obstruct Epsilon's permitting efforts with the Pennsylvania Department of Protection.  It is not a question of *if* Chesapeake will continue to harm Epsilon, it is a question of *when* Chesapeake will have the next opportunity to harm Epsilon.

Without the potential relief afforded by a general declaratory judgment claim, any claim based on Chesapeake's conduct would have to be tied to a specific well proposal and would time out before relief could be attained.  Without the prospect of a general declaratory judgment, any relief is illusory.

## 2. The Amended Complaint included a general request to declare Epsilon's right to drill new wells under the JOAs.

In reliance upon the above case law, Epsilon moved for reconsideration on the basis that — while valid proposals may have been required for Epsilon to pursue claims for specific performance — such proposals were not required to assert its claim for declaratory relief.  ECF 124 at 5-10.  The District Court retreated from its

suggestion that Epsilon must issue new proposals in order to assert a cognizable claim against Chesapeake. Appx44. However, the District Court denied reconsideration based on its conclusion that Epsilon had *chosen* to limit the Amended Complaint to declaratory relief involving the proposals that Epsilon submitted in May 2021. Appx0043-0044. This conclusion is wrong.

The allegations in the paragraphs that comprise the declaratory judgment count of the Amended Complaint make clear that Epsilon's request for declaratory relief was not based exclusively upon the existence (and breach) of any particular proposal that Epsilon issued. To the contrary, the WHEREFORE clause in the declaratory judgment claim states in pertinent part:

> WHEREFORE, Epsilon asks the Court to enter a judgment in its favor declaring that, if CHK elects not to participate in a new well proposed by Epsilon and declines to serve as the operator, then (1) Epsilon (or another consenting party) has the right to drill and operate the proposed new well; (2) CHK has an obligation to allow Epsilon (or another consenting party) to access the jointly-owned assets in order to do so, including taking any actions required to facilitate such access; …

Appx0098-0099. On their face, these requests for declaratory relief pertain to any new well that Epsilon might propose in the future in which Chesapeake declines to participate and serve as the operator.

While the District Court noted that Epsilon defined the wells that it had proposed drilling on the Craige Well Pad in the Amended Complaint as the "Proposed Wells," those wells had been the subject of two separate proposals, at

different times.  The Amended Complaint states that (1) Epsilon initially issued proposals to drill the Proposed Wells in December 2020 and (2) issued a second set of proposals to drill the Proposed Wells in May 2021 after the District Court ruled that the first set of proposals had expired.  Appx84, 94 at ¶¶ 92, 128-29.  The definition of Proposed Wells is therefore not tied to a specific proposal issued on a particular date, but instead refers to wells on the Craige Well Pad that had already been the subject of different proposals.

Even though its declaratory judgment claim was not based on any specific dated proposal, Epsilon had good reason to reference the two separate proposals to drill the Proposed Wells:  namely, to demonstrate that a justiciable controversy exists.  Epsilon needed to advise the District Court of the existence of the Proposed Wells (and Chesapeake's responses to the two separate proposals to drill those Proposed Wells) to demonstrate that Epsilon did not seek an advisory opinion involving a hypothetical dispute, but instead, sought to resolve an actual controversy regarding Epsilon's right to drill new wells in which Chesapeake elects not to participate.  *See* Appx0096-0098 at ¶¶ 146-54.

In short, Epsilon crafted the Amended Complaint to plead a ripe controversy involving the JOAs and Settlement Agreement that was not dependent upon the existence and/or breach of any specific proposal to drill any particular well.  The District Court's contrary conclusion ignored the plain language in the Amended

Complaint. Accordingly, the District Court erred by dismissing Epsilon's claim for declaratory relief.

**3.      The District Court's admission that Epsilon could plead a valid claim for declaratory relief confirms that its dismissal without leave to amend was erroneous.**

A district court must not dismiss a lawsuit without leave to amend if the plaintiff could amend the complaint to cure the deficiency. *Shane v. Fauver*, 213 F.3d 113, 116 (3d Cir. 2000). As the Third Circuit recently held, "before dismissing a complaint for failure to state a claim, 'a district court must permit a curative amendment unless such an amendment would be inequitable or futile.'" *Gannaway v. Stroumbakis*, 842 F. Appx 725, 730 (3d Cir. 2021) (internal citation omitted).

Importantly, the district court must permit amendment even if plaintiff did not request leave to amend in opposing the motion to dismiss. *Shane*, 213 F.3d at 116 ("The Federal Rules of Civil Procedure do not address the situation in which a deficiency in a complaint could be cured by amendment but leave to amend is not sought. Circuit case law, however, holds that leave to amend must be given in this situation as well"); *Borelli v. City of Reading*, 532 F.2d 950, 951 n.1 (3d Cir. 1976). As this Court has explained, "the mere fact that a defendant files a motion to dismiss is not necessarily sufficient to put a plaintiff on notice that the court will find his complaint to be deficient." *United States ex rel. Customs Fraud Investigations, LLC. v. Victaulic Co.*, 839 F.3d 242, 249-50 (3d Cir. 2016) (noting the increased filing of

motions to dismiss following *Twombly* and *Iqbal* but that "[m]ore frequent motions to dismiss are not necessarily more meritorious motions to dismiss.") (citations omitted).

In its motion for reconsideration, Epsilon advised the District Court that it seeks a general declaration regarding its rights under the JOAs and Settlement Agreement.  Epsilon argued that it pled a cognizable claim to obtain such relief in its Amended Complaint that was not based upon, and could exist independent of, the proposals that it issued in May 2021.  While the District Court disagreed that Epsilon had pled such a claim in the Amended Complaint, it conceded that Epsilon could plead such a cognizable claim.  The District Court nevertheless denied the motion for reconsideration, and thereby refused to permit Epsilon to amend its declaratory judgment claim.

The District Court's erroneous ruling is perplexing.  Once it conceded that Epsilon could plead a cognizable claim for declaratory relief under the JOAs that was not dependent upon the existence of a valid proposal to drill a new well, binding Third Circuit precedent required the District Court to grant Epsilon leave to attempt to do so.  The District Court's dismissal of the Amended Complaint without leave to amend, after conceding that amendment was possible, constitutes reversible error.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should REVERSE the District Court's ruling that the 90-day commencement deadline in Article VI.2(a) of the JOAs unambiguously applies to the drilling of new wells, REVERSE the dismissal of Epsilon's declaratory judgment claim in Count I of the Amended Complaint, and REMAND the case for further proceedings before the District Court.

Dated: July 25, 2022

Respectfully submitted,

*s/ Gregory J. Krock*

Gregory J. Krock
Pa. I.D. No. 78308

**MCGUIREWOODS LLP**
Tower Two–Sixty
260 Forbes Avenue, Suite 1800
Pittsburgh, PA 15222–3142
(412) 667–6042
gkrock@mcguirewoods.com

Matthew Fitzgerald
**MCGUIREWOODS LLP**
Gateway Plaza
800 East Canal Street
Richmond, VA 23219–3916
(804) 775–4716
mfitzgerald@mcguirewoods.com

Elizabeth M. Thomas
**MCGUIREWOODS LLP**
Fifth Third Center
201 North Tyron Street, Suite 3000
Charlotte, NC 28202

(704) 373–8060
ethomas@mcguirewoods.com

*Counsel for Appellant/Cross–Appellee*
*Epsilon Energy USA, Inc.*

## <u>CERTIFICATE OF BAR MEMBERSHIP</u>

I, Gregory J. Krock, hereby certify that I am a member in good standing of the Bar of the United States Court of Appeals for the Third Circuit.

/s/ Gregory J. Krock
Gregory J. Krock
Pa. I.D. No. 78308

## <u>CERTIFICATE OF COMPLIANCE REGARDING FORM OF BRIEF</u>

The undersigned hereby certifies that this brief complies with the type–volume limitations contained in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure. Exclusive of exempted provisions as set forth in Rule 32(a)(7)(B)(iii) of the Federal Rules of Appellate Procedure, this brief contains 10,355 words according to the word count function in the Microsoft Word software with which this brief was produced. The full text of the print and electronic versions of this brief filed with the Clerk of Courts and served upon counsel are identical.

/s/ Gregory J. Krock
Gregory J. Krock

## **CERTIFICATE OF COMPLIANCE WITH VIRUS CHECK**

The undersigned hereby certifies that the electronic copy of this brief filed with the Court has been scanned with CrowdStrike Falcon Sensor, Version scanning software product version 6.31.14505.0S and was found to be free of any viruses known as of this date.

/s/ Gregory J. Krock
Gregory J. Krock

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies the foregoing **First Step Brief of Appellant/Cross-Appellee** was filed electronically via the Courts CM/ECF system on the 25th day of July 2022, which system will effectuate service upon the following Filing Users via a Notice of Docket Activity:

Daniel T. Brier
John B. Dempsey
Nicholas F. Kravitz
Richard L. Armezzani
MYERS, BRIER & KELLY, LLP
425 Biden Street, Suite 200
Scranton, PA 18503
*Counsel for Appellee/Cross–Appellant*

/s/ Gregory J. Krock
Gregory J. Krock

**McGUIREWOODS LLP**
Tower Two–Sixty
260 Forbes Avenue, Suite 1800
Pittsburgh, PA 15222–3142
(412) 667–6042

*Counsel for Appellant/Cross–Appellee
Epsilon Energy USA, Inc.*